58 N.Y.2d 231 (1983)
In the Matter of Lazaro Saumell, Respondent,
v.
New York Racing Association, Inc., Appellant, and New York State Racing and Wagering Board, Respondent.
Court of Appeals of the State of New York.
Argued January 10, 1983.
Decided February 23, 1983.
Thomas F. Curnin, Joseph I. Loonan, Devereux Chatillon and Kevin J. Burke for appellant.
Joseph A. Faraldo and Beth J. Goldmacher for Lazaro Saumell, respondent.
Robert Abrams, Attorney-General (Robert S. Hammer and Peter H. Schiff of counsel), for New York State Racing and Wagering Board, respondent.
Judges JONES, WACHTLER and FUCHSBERG concur with Judge MEYER; Judge JASEN concurs in part and dissents in part and votes to modify in accordance with his opinion in which Judge SIMONS concurs; Chief Judge COOKE dissents in part and votes to affirm in another opinion.
*234 MEYER, J.
The common-law right of the New York Racing Association (NYRA) to exclude persons from its premises includes the right when there is reasonable cause to believe a jockey licensed by the New York State Racing and Wagering Board (the Board) guilty of misconduct to deny him access. In doing so, however, NYRA must conform to the requirements of due process. Although a presuspension *235 hearing is not in all cases a due process requirement, due process was violated by the exclusion of petitioner without prior hearing or notice to him concerning the claimed misconduct. The order of the Appellate Division should, therefore, be modified by deleting therefrom so much as struck from Special Term's order the provision permitting NYRA to bring a subsequent expulsion proceeding and as so modified, should be affirmed.
NYRA, which owns and operates Aqueduct, Belmont Park and Saratoga racetracks, is incorporated under what is now section 202 of the Racing, Pari-Mutuel Wagering and Breeding Law (L 1982, ch 865, eff April 1, 1983) "for the purpose of conducting races and race meetings * * * and serving the best interest of racing generally." Under that section it has "all the general powers of corporations created under the laws of this state, including the powers and obligations of stock corporations" (id., subd 3). It operates under a 25-year franchise granted by the Board (id., § 208). The Board is a State agency (id., § 101) empowered to license running races and race meetings (id., § 207) and to license participants in and employees at race meetings, including jockeys (id., § 213).
Petitioner is a jockey licensed by the Board. In an article 78 proceeding against both NYRA and the Board, he alleged that NYRA had usurped the power of the Board by summarily revoking his license on July 12, 1981, based on an asserted violation of a Board rule (9 NYCRR 4042.1 [e]) that occurred three weeks prior, on June 22, 1981; that NYRA was without authority to do so; and that summary revocation was imposed without a hearing in violation of the State Administrative Procedure Act and his right to due process under the United States Constitution. His petition asked judgment enjoining NYRA from depriving him of rights incident to his license and directing the Board to insure that NYRA not interfere with the Board's licensing function.
Supreme Court, Queens County, on the petition and affidavits presented granted the petition, annulled NYRA's July 12, 1981 determination and enjoined NYRA and the Board from any action impeding petitioner's rights under his license, without prejudice, however, to a hearing *236 being held by either respondent. It did so on the ground that the Board had neither made any charge nor held the hearing required by subdivision 3 of section 213 of the Racing, Pari-Mutuel Wagering and Breeding Law and that subdivision 3 of section 401 of the State Administrative Procedure Act and the due process clause of the Federal Constitution required a presuspension hearing, absent a finding that the public welfare required emergency action, before NYRA could deny access.
The Appellate Division modified on the law by deleting the decretal provision permitting NYRA to proceed with a hearing and dismissed the proceeding as to the Board. It recognized NYRA's duty to help insure the interests of legitimate racing and held that although NYRA's decision to act quickly in furtherance of those interests did not infringe upon Board authority while the Board itself was considering disciplinary action, the Board having taken no action against petitioner, his continued suspension by NYRA infringed upon the Board's licensing authority. The matter is before us by leave of the Appellate Division.
Neither court below made express findings of fact and the affidavits of the parties conflict concerning the nature of the hearing offered by NYRA. It would, therefore, be necessary to remand were it not for our conclusion that, considered in the light most favorable to NYRA, the papers do not establish a basis for its exclusion of petitioner from its facilities without a presuspension hearing. Those papers show that on June 22, 1981, petitioner rode horse No. 7 of eight horses competing in the second race. As the horse approached the starting gate, into which the first six horses had already entered, and when it was about 15 feet from the gate, Dr. Gilman, the NYRA examining veterinarian, observed an object hit the left side of the rib cage of the horse and fall to the track. He picked up the object and in placing it in his pocket received a severe electric shock. It was turned over to the NYRA steward and a memorandum of the incident was made that day by Dr. Gilman.
An investigation was undertaken by NYRA, which also notified the Board of the incident. During the investigation, petitioner was twice requested to submit to a lie detector test and declined both requests. During such a test *237 on July 10, 1981 of the trainer of the horse petitioner had ridden on June 22, the trainer, after having been told after denying knowledge of the matter that the detector indicated he was not telling the truth, is alleged to have said that petitioner told him after the race that "I dropped my gator. I think the Doctor picked it up." On July 12, 1981, NYRA's president caused to be served on petitioner a letter informing him that "[o]n the basis of all the information presently before us" he was denied access to NYRA tracks until further notice but that NYRA would "provide you and your counsel with an immediate opportunity to be heard before a panel appointed by me." The basis for the exclusion was stated to be that petitioner was on June 22, 1981 in possession of an illegal electrical device, that possession of such a device was a violation of Board regulations, that petitioner during the investigation "failed to cooperate fully" and that NYRA had a vital interest in "assuring that patrons have confidence that the sport is being honestly conducted."
Separate investigations were thereafter conducted by the Board and by the Nassau County District Attorney. During those investigations the trainer is alleged to have denied making the statement attributed to him by NYRA's investigator. On July 22, 1981, the Grand Jury declined to indict. The Board has since taken no disciplinary action against petitioner but on this appeal urges that "the order of the Appellate Division should be reversed to the extent it denies racetracks the right to exclude licensees in the exercise of sound business judgment." NYRA concedes for the purposes of this proceeding that its exclusion of petitioner constitutes "State action."
We conclude that NYRA retains its common-law right of exclusion and is not governed by the State Administrative Procedure Act, but that in view of its State action concession and the substantial rights of which exclusion deprived petitioner it was a violation of petitioner's constitutional rights to exclude him from NYRA facilities without a prior hearing. We, therefore, modify the Appellate Division's order as above indicated.

*238 I
It is not entirely clear from the Appellate Division memorandum whether it predicated its holding upon pre-emption, as its citation of Jacobson v New York Racing Assn. (33 N.Y.2d 144, 150) suggests, or an improper delegation of power, as is suggested by its citation of Matter of Capital Dist. Regional Off-Track Betting Corp. v New York State Racing & Wagering Bd. (54 N.Y.2d 154) and Matter of Fink v Cole (302 N.Y. 216). In our view neither doctrine bars NYRA's exclusion of petitioner from its premises.
Involved in this case are two separate and distinct rights. Jacobson held only that a racetrack proprietor's common-law right to exclude undesirable patrons without reason or excuse, so long as not discriminatory, did not extend to persons licensed by the State, as to whom, however, exclusion in "the best interest of racing generally" and in the exercise of "a reasonable discretionary business judgment" was permissible (33 NY2d, at p 150). Matter of Fink held no more than that the Legislature cannot constitutionally delegate to a private corporation its power to license participants and employees at race meetings, and the Capital Dist. holding is no broader (see 54 NY2d, at p 158).
Here there exists no delegation of the licensing power, that function having been given only to the Board (Racing, Pari-Mutuel Wagering and Breeding Law, § 213). Nor is there anything in the latter statute to suggest that the Legislature intended to pre-empt NYRA's common-law power of exclusion (cf. People v De Jesus, 54 N.Y.2d 465; Monroe-Livingston Sanitary Landfill v Town of Caledonia, 51 N.Y.2d 679, 683; Robin v Incorporated Vil. of Hempstead, 30 N.Y.2d 347) and the Board, by regulation (9 NYCRR 4022.12), has explicitly recognized that that common-law power continues.[1] That in practical effect NYRA's power of *239 exclusion may infringe upon a licensee's ability to follow at NYRA's tracks the pursuit for which licensed should not for that reason alone be given pre-emptive effect, for the Board has full authority to protect its licensing power through revocation of NYRA's franchise (see Racing, Pari-Mutuel Wagering and Breeding Law, § 208, subd 6; § 210).
The licensing power of the Board being independent of and separate from NYRA's common-law right to exclude a licensed person in the best interests of racing,[2] the fact that the Board has taken no action to revoke petitioner's license had no bearing upon the right of NYRA to exclude petitioner in the first instance or upon the continued effectiveness of the exclusion previously effected by NYRA.

II
Whether petitioner was excluded in conformance with applicable statutory and constitutional requirements remains for discussion. Subdivision 3 of section 213 of the Racing, Pari-Mutuel Wagering and Breeding Law requires notice and a hearing before revocation of a license but by its terms is limited to a revocation by the Board. Subdivision 3 of section 401 of the State Administrative Procedure Act limits summary suspension to a situation which "imperatively requires emergency action" but can be applied to NYRA only if it is "a public benefit corporation or public authority at least one of whose members is appointed by the governor" (State Administrative Procedure Act, § 102, subd 1). NYRA has directors or trustees and stockholders, not members, and is a private corporation (Racing, Pari-Mutuel Wagering and Breeding Law, § 202, subd 3), not a *240 public benefit corporation (General Construction Law, § 66, subd 4). Nor is NYRA's concession for the purposes of this proceeding that its determination to exclude petitioner constitutes "State action" any reason for invoking the State Administrative Procedure Act, to the extent that the requirement of subdivision 3 of section 401 exceeds the requirements of due process.
The issue is thus reduced to whether, "State action" being so conceded, petitioner's exclusion without a prior hearing conforms with the requirements of due process. Determination of that question requires a balancing of three factors: (1) the private interest affected, (2) the possibility of error in the procedure used and the probable value of other or additional procedural safeguards, and (3) the interest protected by the "State action" taken and the burdens that other or additional safeguards would impose (Memphis Light, Gas & Water Div. v Craft, 436 US 1, 17; Mathews v Eldridge, 424 US 319, 334-335). Here NYRA's interest in assuring confidence in the honesty of its activities would have sustained a prehearing exclusion had such a determination followed promptly after the incident and been followed by the offer of an immediate hearing. Having demonstrated by delaying exclusion for 20 days that the incident created no crisis of confidence, however, NYRA could not then impose upon petitioner the substantial deprivation[3] resulting from exclusion without first affording him a hearing.
The Memphis Light case and Barry v Barchi (443 US 55) provide the framework for that conclusion. Memphis Light established "`some kind of hearing' prior to the deprivation of a significant property interest" as the rule (436 US, at p 19; see, also, Parratt v Taylor, 451 US 527, 540; Friendly, "Some Kind of Hearing", 123 U of Pa L Rev 1267), but recognized that under appropriate circumstances an "informal consultation" could suffice (436 US, at p 16, n 17) and that prehearing deprivation would be permissible if the deprivation was not serious and the procedure used *241 sufficiently reliable (436 US, at p 19). It held, however, that the deprivation of utility service for any appreciable time and the possibility of error in utility cutoff decisions were sufficiently great to require a hearing prior to termination. Barry recognized that a horse trainer's property interest in his license was sufficient to invoke the protection of the due process clause and that the trainer's interest in avoiding suspension was substantial, but held the State's interest in preserving the integrity of racing and protecting the public from harm sufficiently great and probable cause to believe that a horse had been drugged through the trainer's negligence, at least, sufficiently established to authorize prehearing suspension followed by a prompt hearing and disposition of the issue.
Postponement of suspension "pending an adversary hearing to resolve questions of credibility and conflicts in the evidence" was not required in Barry because there existed an affirmance by the State's expert, based on urinalysis, that the horse in question had been drugged, because the trainer worked under a Board rule which established a rebuttable presumption based on drugging that the trainer was at least negligent, and because the trainer was notified immediately of the alleged drugging, 16 days elapsed between that notice and the denial of access and he was given more than one opportunity to present his side of the story to the State's investigator and had in fact done so without demonstrating convincingly that he was not negligent (443 US, at p 64).
The interests of petitioner and NYRA in this case are the same as the interests of Barchi and the State in Barry, but the present case stands in stark contrast to Barry with respect to the reliability of the procedure used and the risk of erroneous determination. Here no rebuttable presumption existed, and though it appears that petitioner twice declined the opportunity to take a lie detector test, nothing in the record establishes that he was advised why he was being offered the opportunity, was told why the investigation was being made, or was informed that he was the object of it. So far as the record discloses, petitioner was first advised of the charge not two days after the event, as was Barchi, but 20 days after, when he received NYRA's *242 exclusion letter. Although Barchi had 14 days after being so advised in which to attempt to clear himself before suspension, petitioner had, so far as appears, no benefit from the 20 days that elapsed and was faced with the Hobson's choice of an immediate hearing without a full opportunity to prepare or deferring the hearing for a sufficient time to prepare but with consequent loss of income.
In contrast to the chemical evidence of illegal drugging by someone in Barry, stands the much less incriminating facts that while Dr. Gilman saw the device hit the rib cage of the horse he could not say from where it came, nor, other than his statement that the horse made no sudden movement when the object hit its left side, is there anything to suggest that it came from or had ever been in the possession of petitioner rather than that of some third person. True there was a statement from the trainer of the horse detailing an admission by petitioner, but the reliability of the statement in view of the trainer's possible inculpation in the use of such a device was very much more open to question[4] than was the Barry evidence. Finally, the conduct of which Barchi was accused was negligently allowing the horse to be drugged, whereas petitioner was accused of a crime; one is an intentional and the other a negligent act. Although NYRA was not obligated to resolve questions of credibility before denying petitioner access to its facilities, the evidence as to possession of the battery upon the basis of which NYRA acted was at best equivocal and, in light of the 20-day delay and the importance of access to petitioner's livelihood, an insufficient basis for exclusion without a hearing. Nor did the accusation of failure to co-operate in the investigation authorize such an exclusion, for the record discloses nothing about the circumstances under which he was requested to co-operate, or, indeed, whether any request other than that he take a lie detector test was made (cf. Gilmour v New York State Racing & Wagering Bd., 405 F Supp 458).
That NYRA improperly denied petitioner's right of access without a hearing does not, however, foreclose its *243 right to proceed with a hearing as a basis for exclusion if it be so advised. Although we need not, in view of the conclusion reached, consider all of the factual and legal issues relating to the nature of the hearing offered, we deem it not improper in view of the possibility that such a hearing may be held, to note that nothing in the record establishes that President Heffernan, who signed the July 12 letter, would be a member of the hearing panel or have any relation to it other than as the appointment authority, and that there would be no constitutional impropriety in his appointing the panel (Withrow v Larkin, 421 US 35, 56-58; Wolff v McDonnell, 418 US 539, 570-571; Richardson v Perales, 402 US 389, 410; Goldberg v Kelly, 397 US 254, 271).
Accordingly, the order of the Appellate Division should be modified as above indicated and, as so modified, affirmed.
JASEN, J. (concurring in part, dissenting in part).
I differ with the majority as to the extent of the New York Racing Association's right to exclude licensees from it premises. In my view, three issues must be evaluated in order to decide this appeal. They are: (1) to what extent has the NYRA's common-law right to exclude persons from its racetracks been compromised by its State franchise which gives it a virtual monopoly over thoroughbred racing; (2) when it exercises that right, what safeguards are required by due process to protect the petitioner's property rights in his license; and (3) at what point must this right yield totally to the State's power to license.
In Jacobson v New York Racing Assn. (33 N.Y.2d 144), we recognized that because of the NYRA's monopolistic nature, its common-law right to exclude persons did not afford it absolute immunity when that right was exercised against persons licensed by the State to work at racetracks. "Exclusion from its tracks is tantamount to barring the plaintiff from virtually the only places in the State where he may ply his trade and, in practical effect, may infringe on the State's power to license horsemen." (Jacobson v New York Racing Assn., supra, at pp 149-150.) Thus, we held that the plaintiff could seek damages if he could prove that the NYRA wrongfully barred him from its tracks and thereby interfered with his license. The case being before *244 us on the limited basis of a certified question as to the propriety of an action for damages against the NYRA, we did not address what would be required of the NYRA when it believed it had a reasonable basis for excluding a licensee. In order to determine what action the NYRA is required to take and is allowed to take, I believe we must evaluate the various rights and authorities involved.
The unique nature of the NYRA affects the rights it possesses. It is a nonprofit racing association which, pursuant to a franchise granted by the State, conducts horse racing and related betting activities at three of the four thoroughbred racetracks in this State. (L 1926, ch 440, as amd by L 1976, ch 840.) The statute authorizing such franchises requires that they be regulated and controlled by the New York State Racing and Wagering Board. (L 1926, ch 440.) That means that although the NYRA has the form of a not-for-profit corporation, its rights and privileges as a corporate entity are subject to regulation and limitation by that Board in exchange for its monopolistic status. Thus, in Jacobson, we held that its immunity from suit when it excluded a licensed person was not absolute but was limited to those cases where it could show that the exclusion was related to the best interests of racing generally. We concluded, however, that even though the NYRA was not immune from suit, the burden would be on the plaintiff to establish that in barring him from their tracks, the NYRA was not motivated by the best interests of racing or that it had no legitimate business reason for doing so. (Jacobson v New York Racing Assn., supra, at p 150.) In so limiting our holding, we clearly recognized that the NYRA was subject to Board regulation and was limited by policy from acting in any manner which would infringe on a person's license unless that action could be justified.
The implication of our holding was that any action by the NYRA was subject to further review and regulation by the Board. Anything less would abrogate the Board's statutory authority over all such franchises. Similarly, to allow the NYRA to take an action against a licensee which amounted, because of the NYRA's monopoly, to a de facto revocation of that license would also cause the Board's *245 licensing authority to be abrogated. Since this petition seeks, rather than damages, an injunction to keep the NYRA from interfering with the Board's licensing power, I believe we must decide at what point the Board's licensing authority takes priority over the NYRA's rights to run its racetracks and exclude persons it believes harm its enterprise. In determining that point, it must be recognized that the authority to license jockeys, trainers and owners is vested by the Legislature in the Racing and Wagering Board. (L 1926, ch 440, as amd by L 1952, ch 77.) When that Board determines that they are entitled to a license, it decides that they are qualified to work at the racetracks in this State. The Board also is authorized to suspend a licensee or revoke a license if it determines, after a hearing, that the licensee has violated the rules and regulations concerning appropriate conduct. (L 1926, ch 440, as amd by L 1951, ch 324.) Given this broad authority, it is the Board which should make the final determination on a licensee's status.
The further implication from this is that only the Board can take action involving a license because that license is a property interest and the licensee is entitled to certain due process rights before that property interest is taken. This accounts for the statutory mandate and Board's regulations which require notice and a hearing before a license can be revoked. (L 1926, ch 440, as amd by L 1951, ch 324.)
Underlying our holding in Jacobson, then, are three principles: First, that by accepting its monopoly, the NYRA accepted certain limitations on the common-law rights a proprietor of a private enterprise enjoys; secondly, that a license granted by the State Racing and Wagering Board to work at racetracks is a property right protected by requirements of due process; finally, that the ultimate resolution of a person's fitness to hold a license and to be involved in horse racing in this State lies with the agency charged with overseeing the sport and business of horse racing. The intertwined nature of these rights, therefore, does effect the NYRA's ability to bar a licensed jockey from its tracks.
In this case, I would hold that the NYRA can exercise its right to exclude in order to protect its property interests in *246 racing, but only to the extent of temporarily barring the petitioner from its racetracks. To do so, it would be required to have a valid reason and employ some due process safeguards. At that point, because anything other than a temporary suspension pending a hearing would impose on a licensee's property rights in that license and in turn interfere with the State's licensing power, I would require the NYRA to refer the matter to the Racing and Wagering Board. That agency can then afford the licensee the additional protection of a hearing before an impartial panel before resolving his continuing status. Assuming the complaint brought by the NYRA is proven at the hearing, it will then be the licensing board which will decide the appropriate sanction  suspension for a period of time or revocation of the license. The licensee will not have been deprived of his property rights in that license until he has been afforded complete due process protections. Similarly, the Board would retain its control over licensing, but the NYRA's interest in maintaining the integrity of racing would be protected because once it had good cause to believe that the licensee was acting in an improper manner, it could exercise its common-law right to exclude. It would thereby protect its proprietary interests and fulfill its obligation to act in the best interest of racing. I recognize that the NYRA could seek an immediate suspension at the time of the incident from the Board steward present at the track. (9 NYCRR 4022.12.) The fact that an alternative remedy is available I do not find dispositive of the issues presented by this case, particularly because some reasons for exclusion may occur or come to light at times other than when races are being run and the steward is present. Moreover, that regulation specifically provides: "Nothing in this section shall be construed to limit any racing association or track licensee's power to exclude or deny any individual from its grounds or privileges thereon." (9 NYCRR 4022.12.)
I would agree with the majority, however, that it flows naturally from the NYRA's unique status and from the imposition of the requirement that good cause must exist for the NYRA to exclude a licensee that the NYRA must act in a manner that comports with due process when it *247 temporarily bars the licensee. Since the Board will afford the licensee a full and fair hearing, I believe the only requirements that should be imposed on the NYRA before it can bar a licensee from its track are that it give the licensee prompt notice of the charges, an opportunity to review the basis of those charges and that it immediately refer those charges to the Board.
Accordingly, I would modify the order of the Appellate Division by granting the petition to the extent that it barred the NYRA from interfering with the State Racing and Wagering Board's licensing power and by requiring that any further disciplinary hearing be brought before that Board.
Chief Judge COOKE (dissenting in part).
I cannot agree with the majority's conclusion that under the State's statutory scheme governing the issuance and revocation of licenses to participants in thoroughbred horse racing meets, a private franchisee retains an independent right to exclude licensees in good standing from its tracks. The Legislature vested exclusive authority over licensing in the New York State Racing and Wagering Board (Board). Inasmuch as the New York Racing Association (NYRA), a private franchisee, excluded petitioner for reasons that directly infringe on the Board's licensing power, such exclusion was improper.
In creating the Board, the Legislature stated in broad and inclusive terms that the Board "shall have general jurisdiction over all horse racing activities * * * in the state and over the corporations, associations, and persons engaged therein" (Racing and Wagering Board Law, § 201, subd 1, L 1973, ch 346, § 3). Moreover, consistent with this broad power, the Board, "[f]or the purpose of maintaining a proper control over [thoroughbred horse] race meetings," was expressly granted the exclusive power to license the various participants in these meets (see L 1926, ch 440, § 9-b, subd 1, as added by L 1951, ch 324, as amd by L 1952, ch 77, § 1, L 1953, ch 773, § 2, L 1956, ch 12, § 1, L 1957, ch 539, § 1, L 1958, ch 30, § 1, L 1960, ch 828, § 1, L 1968, ch 548, L 1973, ch 208, § 1, L 1981, ch 103, § 167).
*248 The issuance of such licenses is to be based on the Board's determination that the "financial responsibility, experience, character and general fitness of the applicant are such that the participation of such person will be consistent with the public interest, convenience or necessity and with the best interests of racing generally" (L 1926, ch 440, § 9-b, subd 2, as added by L 1951, ch 324, as amd by L 1952, ch 77, § 1). As a part of this power, the Board "may refuse to issue or renew a license, or may suspend or revoke a license" based on detailed criteria bearing on an applicant's or a licensee's moral fitness.[1] Pursuant to its authority, the Board has promulgated regulations setting forth various restrictions on licensees (see, e.g., 9 NYCRR 4040.1-4040.15), detailing corrupt practices (see 9 NYCRR 4042.1), and empowering the Board's individual stewards to exclude or suspend persons from track grounds (see 9 NYCRR 4022.12).[2]
The Board's members are public officers (see Racing and Wagering Board Law, § 201, subd 2, L 1973, ch 346, § 3) and no member of the Board, or its officers, officials, or employees may have an interest in the "operations of any *249 licensee or franchisee of the board" (Racing and Wagering Board Law, § 201, subd 7). The NYRA, on the other hand, is merely a private, nonprofit franchisee, empowered, subject to the Board's continuing jurisdiction, to "conduct a race course or race meetings for running races or steeplechases or hunt meetings" (L 1926, ch 440, § 7-a, as added by L 1955, ch 812, § 2). The officers of the NYRA are not public officers; they are not sworn or removable as such. The Legislature permitted the NYRA's incorporation solely for the purpose of "conducting races and race meetings, improving the racing facilities, increasing the conveniences available to patrons and serving the best interest of racing generally" (L 1926, ch 440, § 1-a, as added by L 1955, ch 812, § 1). Nowhere under the statutory scheme is the Board's licensing power and concomitant power to revoke or suspend licenses limited or derogated in favor of the NYRA. The majority, nevertheless, finds that the NYRA in effect shares with the Board the power to suspend Board licensees from participating in track meets by virtue of a "common-law right of exclusion" (p 237).
When this court, in Jacobson v New York Racing Assn. (33 N.Y.2d 144), affirmed a common-law right of the NYRA, as a proprietor, to exclude patrons from its premises and to allocate or deny its limited stall space to licensees in accordance with the exercise of reasonable, discretionary business judgment, it also noted that "[e]xclusion from its tracks is tantamount to barring [an individual] from virtually the only places in the State where he may ply his trade and, in practical effect, may infringe on the State's power to license horsemen" (id., at pp 149-150). In Jacobson, the NYRA was required to justify its business decision to deny stall space because its action would have the effect of excluding licensees. The court did not countenance the outright exclusion of licensees from participation whenever and for no other reason than that such exclusion would, in the judgment of the NYRA, further the best interests of racing generally and constitute a reasonable, discretionary business judgment.
*250 Whatever may have been the extent of the NYRA's common-law power to exclude persons from its tracks, it certainly is curtailed by the Legislature's express delegation of licensing power to the Board, and by the Legislature's exposition of explicit criteria for evaluating license revocations. In Matter of Fink v Cole (302 N.Y. 216), this court struck down as an improper delegation of legislative power statutes that conferred upon the Jockey Club, a private corporation, the power over issuance and revocation of licenses to jockeys (id., at p 225). The Legislature by enacting these statutes recognized, that for a private body to have the power to effect licensing decisions, an express statutory grant was necessary. In other words, upon assumption by the Legislature of the power to regulate racing generally, private bodies were impotent to intrude into licensing and disciplinary matters.
The majority's interpretation of the NYRA's power to exclude gives that private franchisee the functional equivalent of a power to revoke or suspend licenses issued by the Board. Presumably, under this holding, if the NYRA should decide that activities on the part of a licensee permit it to invoke its common-law power to exclude licensees from its track facilities in the best interests of racing, it may do so deqpite a contrary plenary determination by the Board that no discipline is necessary. So long as the NYRA's exclusion policy cannot be said to have been motivated by anything other than advancing the best interests of racing and constitutes a reasonable exercise of business judgment, its determination will not be disturbed by the courts regardless of whether conflicting factual or policy findings are made by the Board. It is unrealistic to assume, as the majority does (see pp 238-239), that such an inconsistent result could or would be remedied by the Board through the extraordinary act of revoking the NYRA's franchise, thereby disrupting all racing at the Belmont, Aqueduct and Saratoga racetracks and causing economic hardship to the many innocent persons associated with those establishments.
The State's interest in entrusting to a single public body the power to determine the qualifications of potential and present licensees, thereby ensuring responsible and consistent *251 policy, outweighs any harm that might accrue to the NYRA or similarly situated franchisees by denying to them a concurrent power. When an infraction of racing regulations such as has been alleged here is brought to the NYRA's attention, it need only refer the matter to the Board, which is charged with then taking appropriate action. A Board representative, a steward, is present on racetrack grounds at all times during racing meets (see 9 NYCRR 4022.3) and is expressly empowered to exclude from the facility for up to 60 days any person who acts in a manner that is detrimental to the best interests of racing (see 9 NYCRR 4022.12). Moreover, this regulation requires that the Board's steward, before taking any action, consult with the NYRA's steward and afford him or her an opportunity to make recommendations (9 NYCRR 4022.12).
Any disruption or irregularity, therefore, can be swiftly and effectively remedied, pending a Board hearing. Thus, extending to the NYRA any concurrent power to exclude licensees, even on emergency basis, would be unnecessary and superfluous.[3] It is also noteworthy that the NYRA's action here was not a temporary exclusion to meet an emergency, but was rather an attempt to permanently exclude petitioner from its tracks.
Inasmuch as the NYRA has no disciplinary power to exclude licensees, any further action against petitioner should be taken only by the Board. Therefore, the order of the Appellate Division should be affirmed in all respects.
Order modified, with costs to appellant, in accordance with the opinion herein and, as so modified, affirmed.
NOTES
[1] The regulation which deals with the power of the Board steward to exclude persons from the track or suspend a license for up to 60 days concludes with the statement that: "Nothing in this section shall be construed to limit any racing association or track licensee's power to exclude or deny any individual from its grounds or privileges thereon." The suggestion in Chief Judge COOKE's dissenting in part opinion (n 2) that the Board misconstrues its statutory authority assumes that by doing so the Board has delegated its licensing authority. But the extent to which an agency with licensing power should exercise it is a question of "`judgment, discretion, allocation of resources and priorities [which is] inappropriate for resolution in the judicial arena'" (see Jones v Beame, 45 N.Y.2d 402, 407; Matter of Kerness v Berle, 85 AD2d 695, affd 57 N.Y.2d 1042).
[2] The Appellate Division's conclusion that petitioner's exclusion "is based solely on an alleged infraction of a rule of the board" (86 AD2d, at p 606) is not sustained by the record. The infraction, if there was one, violated not only the Penal Law (§§ 110.00, 180.50) and the rules of the Board (9 NYCRR 4042.1 [e]) but was also contrary to the best interests of racing. NYRA's July 12 letter referred both to petitioner's possession of "an illegal electrical device" and to the fact that possession was a Board rule violation, but petitioner's exclusion was stated to be the result of NYRA's determination "in the exercise of our independent judgment, that our investment in our operations, as well as public perception of thoroughbred racing generally, could be seriously compromised if you continue to have access to our facilities."
[3] NYRA has "virtual monopoly power over thoroughbred racing in the State of New York" (Jacobson v New York Racing Assn., 33 N.Y.2d 144, 149). Moreover, petitioner's affidavit indicated that as a result of NYRA's action he had been deprived of the right to ride at a New Jersey track.
[4] Not considered in this evaluation because they came after the suspension are the trainer's later contradictory statements and the failure of the Grand Jury to indict and the Board to institute a proceeding to discipline petitioner or revoke his license.
[1] Specifically, the Board may deny, suspend, or revoke a license "if it shall find that the applicant * * * has been convicted of a crime in any jurisdiction, or is or has been associating or consorting with any person who has or persons who have been convicted of a crime or crimes in any jurisdiction or jurisdictions, or is consorting or associating with or has consorted or associated with bookmakers, touts, or persons of similar pursuits, or has himself engaged in similar pursuits, or is financially irresponsible, or has been guilty of or attempted any fraud or misrepresentation in connection with racing, breeding or otherwise, or has violated or attempted to violate any law with respect to racing in any jurisdiction or any rule, regulation or order of the [Board], or shall have violated any rule of racing which shall have been approved or adopted by the [Board], or has been guilty of or engaged in similar, related or like practices" (L 1926, ch 440, § 9-b, subd 2, as added by L 1951, ch 324, as amd by L 1952, ch 77, § 1).
[2] To the extent that the regulation providing that "[n]othing in this section shall be construed to limit any racing association or track licensee's power to exclude or deny any individual from its grounds or privileges thereon" (9 NYCRR 4022.12), may be construed as authorizing the NYRA to directly exclude licensees from its tracks, it constitutes an invalid delegation by the Board of its power to effect licensing decisions. Nowhere in the statutory framework governing the issuance and revocation of licenses is the Board permitted to delegate to a private racing association the power to exclude licensees. The Board's interpretation of its statutory power as evidenced by this regulation is entitled to no deference (see Kurcsics v Merchants Mut. Ins. Co., 49 N.Y.2d 451, 459). Moreover, as discussed below, inasmuch as the power to exclude is tantamount to the power to effect licensing decisions, the Board cannot under the State Constitution delegate the power to exclude (see Matter of Fink v Cole, 302 N.Y. 216, 224-225).
[3] Similarly, there is no need to fashion a broad emergency power to be invoked by the NYRA to meet those situations when no Board steward is present at the track. The Board has provided that one of its representatives shall be responsible for track activities at all times. Its regulations state that "[d]uring the absence or inability to act of an official steward of the [Board] * * * the powers and duties of such steward shall be exercised and performed * * * by a member of the [Board] designated by the [Board] for that purpose" (9 NYCRR 4022.5). Thus, in the event that an infraction by a licensee arises or comes to the NYRA's attention when no Board steward is present or able to act, a member of the Board shall act in his or her stead. Moreover, if no steward is present because no races are being held, it is almost certain that there would be no emergency.